IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS
312 Montezuma Ave.
Santa Fe, NM 87501,

SIERRA CLUB
85 Second St., Second Floor
San Francisco, CA 94105,

and

DEFENDERS OF WILDLIFE
1130 17th Street N.W.
Washington, D.C. 20036,

       Plaintiffs,

v.

KEN SALAZAR, in his official capacity as Secretary,
U.S. Department of the Interior
1849 C Street NW
Washington, D.C. 20240,

and

ROBERT V. ABBEY, in his official capacity as Director,
Bureau of Land Management
1849 C Street NW Rm. 5665
Washington, D.C. 20240,

       Defendants.

Civil Action No. _____

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     The Powder River Basin in northeastern Wyoming and southeastern Montana is the single largest source of coal in the United States. In 2008, Powder River Basin mines

produced nearly half a billion tons of coal, which accounted for approximately 42 percent of all coal produced in the United States.[1]

2.     WildEarth Guardians ("Guardians") petitioned Ken Salazar, U.S. Secretary of the Interior ("the Secretary"), pursuant to the Administrative Procedure Act, 5 U.S.C. § 553(e), to recertify the Powder River Basin as a "Coal Production Region" under the Federal Coal Leasing Regulations so that leasing in the region would be governed by the Competitive Leasing process. This process requires extensive analysis and consideration of the regional environmental impacts of coal leasing, consultation with the public, the development of a regional leasing plan, and a competitive bidding process.

3.     On January 28, 2011, the United States Bureau of Land Management ("BLM") denied Guardians' Petition to recertify the Powder River Basin as a Coal Production Region. Plaintiffs challenge BLM's denial of Guardians' Petition as arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action to review BLM's denial of Guardians' Petition pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346(a)(2) (civil action against the United States), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). The relief Plaintiffs request is authorized by 28 U.S.C. §§ 2201(a) (declaratory relief) and 2202 (injunctive relief).

5.     Both Defendants reside, in their official capacities, in the District of Columbia. Furthermore, a substantial part of the events and omissions giving rise to the claim in this case

---

[1] *See* U.S. Energy Information Administration, *Annual Coal Report 2009* Tbl. 1 (2010), http://eia.gov/cneaf/coal/page/acr/table1.html.

occurred in the District of Columbia. Therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## PARTIES

6. Plaintiff **WILDEARTH GUARDIANS** is a nonprofit conservation organization with offices in Denver, Colorado and Santa Fe, New Mexico. It brings suit on its own behalf and on behalf of its members. WildEarth Guardians ("Guardians") protects and restores the wildlife, wild places, and wild rivers of the American West. Towards this end, Guardians and its members work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate. Guardians has approximately 4,500 members, many of whom live, work and/or recreate in and in the vicinity of the Powder River Basin in Wyoming and Montana.

7. Plaintiff **SIERRA CLUB** is a national nonprofit organization with more than 600,000 members in the United States, including almost 900 members in its Wyoming Chapter and over 2,000 members in its Montana Chapter, many of whom live, work, and/or recreate in and in the vicinity of the Powder River Basin. The Sierra Club is dedicated to enjoying, exploring, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystem and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass climate change, air quality impacts, water quality, wildlife, and other environmental concerns.

8. Plaintiff **DEFENDERS OF WILDLIFE** is a national nonprofit organization with over one million members and supporters nationwide. Defenders of Wildlife ("Defenders") is one of the country's leading science-based wildlife conservation organizations, and its mission

includes the protection and restoration of America's native wildlife and the safeguarding of natural habitats and public lands. Defenders has worked extensively to protect wildlife, ecosystems, and aquatic resources throughout the country, including the protection of species from, the adaptation of species to, and the planning of federal and state agencies for the impacts of climate change. Defenders has approximately 781 members in Wyoming, including members who live, work, and/or recreate in and in the vicinity of the Powder River Basin.

9. Plaintiffs have members who live, work, recreate, and conduct other activities in the Powder River Basin, its environs, and areas impacted by pollution from power plants which burn Powder River Basin coal. Because Defendants have summarily denied Guardians' Petition to recertify the Powder River Basin as a Coal Production Region, Plaintiffs' members will be exposed to increased and excess air, water, and land pollution; greenhouse gas emissions resulting from coal leasing; and other environmental impacts.

10. Plaintiffs' members are and will be adversely affected by poor air and water quality caused by coal leasing in the Powder River Basin authorized under the Lease-by-Application process. Plaintiffs and their members are also adversely affected by the land disturbance in the Powder River Basin that comes from coal mining, which is usually done by strip mining. For example, Plaintiffs' members have visited and recreated extensively in the proximity of coal lease tracts that BLM has authorized, proposed, and/or otherwise analyzed for leasing under the Lease-by-Application process, including the West Antelope II tracts, the Belle Ayr North and Caballo West tracts, and the "Wright Area" tracts. Beyond the tracts themselves and their direct proximity, Plaintiffs' members have visited and recreated in areas in the vicinity of the former Powder River Basin Coal Production Region, including the Thunder Basin National Grassland, Dull Center, the Rochelle Hills, Campbell County, Converse County, and

areas around the Montana state border. On such trips, Plaintiffs' members have hiked, viewed wildlife, and otherwise enjoyed the landscape and its aesthetic qualities. Plaintiffs and their members are concerned that the impacts from coal mining authorized under the Lease-by-Application process will harm their interests in and enjoyment of these areas and their wildlife. With respect to air quality impacts, Plaintiffs and their members are concerned that mining authorized under the Lease-by-Application process will result in increased air pollution and decreased visibility across surrounding lands, thereby, for example, harming Plaintiffs' members ability to engage in and enjoy hiking, wildlife viewing, and other forms of outdoor recreation. Such impacts will make it less likely that Plaintiffs' members will return to the surrounding lands for recreation purposes.

11.     Plaintiffs and their members also are and will be affected by increased greenhouse gas emissions from coal leasing, mining, and eventual combustion resulting from leases authorized under the Lease-by-Application process, and have a substantial interest in ensuring that Defendants fully addresses the climate change impacts from these increased emissions. With respect to such climate change impacts, the direct, indirect, and cumulative impacts of carbon dioxide and other greenhouse gas emissions from Powder River Basin coal leases will result in greater climate change impacts to the surrounding lands and their wildlife in a number of ways, including more severe drought conditions; increased invasive species; increased fire frequency, severity, and extent; and a reduction in biodiversity and sensitive species. Given that Powder River Basin coal already accounts for over 13 percent of the United States' carbon dioxide emissions, and given that BLM is proposing 12 new coal leases in the Basin that will lead to the release of between 6.19 and 10.6 billion tons of carbon dioxide, Plaintiffs' members are under the belief and understanding that these leases would significantly contribute to such

climate change impacts on the western United States and specifically on the lands and wildlife visited by Plaintiffs' members. If not properly addressed by broad-scale analysis and planning undertaken pursuant to the Competitive Leasing process for certified Coal Production Regions, such impacts would harm Plaintiffs' members' enjoyment of visiting these lands, and they would be less likely to continue such visits and recreation in the future.

12. Plaintiffs and their members are also injured by being denied information that they would otherwise be able to obtain if the Powder River Basin was designated a Coal Production Region and by being denied procedural opportunities they would have if the Powder River Basin was designated a Coal Production Region and leasing was conducted pursuant to the Competitive Leasing process.

13. Plaintiffs' and their members' interests have been, are being, and will continue to be irreparably harmed by Defendants' arbitrary and capricious denial of Guardians' Petition to recertify the Powder River Basin as a Coal Production Region. The relief requested in this lawsuit would redress the injuries of Plaintiffs and their members.

14. Defendant **KEN SALAZAR** is sued in his official capacity as the Secretary of the Interior ("Secretary"). The Secretary oversees the BLM, which has authority to designate coal production regions under 43 C.F.R. § 3400.5. Defendant **ROBERT V. ABBEY** is sued in his official capacity as the Director of the BLM. The BLM has authority to designate coal production regions under 43 C.F.R. § 3400.5.

## LEGAL FRAMEWORK

15. The Administrative Procedure Act ("APA") requires that each agency "shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

16.     The APA further requires that, for petition denials, "prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person" and such "notice shall be accompanied by a brief statement of the grounds for denial." 5 U.S.C. § 555(e).

17.     The APA further provides for judicial review, 5 U.S.C. § 702, for "[any] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

**A.      Federal Coal Leasing Program**

18.     The Secretary is authorized to lease coal deposits owned by the United States through the Mineral Leasing Act ("MLA"), 30 U.S.C. § 181 *et seq*.

19.     Pursuant to the MLA, BLM promulgated regulations for two types of coal leasing processes: Competitive Leasing and the Lease-by-Application process.

20.     Competitive Leasing applies in those areas the Secretary has designated as "Coal Production Regions." As part of this Competitive Leasing process, BLM establishes regional leasing levels that include a ceiling for coal leasing, and delineates lease boundaries based on an assessment of regional environmental impacts and public input. BLM then auctions leases to the highest bidder. *See generally* 43 C.F.R. Subpart 3420.

21.     The Federal Coal Leasing Regulations authorize the Secretary, through BLM, to change Coal Production Regions, or alter their boundaries, through publication of a notice of change in the Federal Register. *See* 40 C.F.R. § 3400.5.

22.     The Lease-by-Application process applies where there is an emergency need for unleased coal or in areas outside Coal Production Regions. This process allows coal companies,

7

rather than BLM, to delineate lease tracts and propose them for leasing. Lease proposals are not based on regional leasing levels or any regional environmental impact analysis. The Lease-by-Application process does not allow BLM to put a ceiling on coal leasing. *See generally* 43 C.F.R Subpart 3425.

### B.   Coal Production and Leasing in the Powder River Basin

23.   The Powder River Basin is located in northeastern Wyoming and southeastern Montana, and covers an area of roughly 24,000 square miles.

24.   Some of the largest deposits of subbituminous coal in the world underlie the Powder River Basin. These large coal deposits make the Powder River Basin the single largest source of coal in the United States.

25.   The U.S. Department of Energy noted that in 2008 alone, a record 495,964,000 tons of coal were mined form the Powder River Basin. This amount comprised approximately 42 percent of all coal produced in the United States. It was more coal produced than from any other region of the country. The Department of Energy also noted that in 2008, the top ten highest-producing coal mines in the United States were all located in the Powder River Basin.

26.   BLM has proposed 12 new coal leases in the Powder River Basin that would collectively mine up to 5.8 billion tons of coal—as much coal as has been mined from the region in the last 20 years. All of these leases were proposed by coal companies seeking to expand their existing mines in the region.

27.   In addition to supplying coal fired power plants in the United States, coal producers are currently exploring options for exporting Powder River Basin coal to foreign markets; in particular, China. In January 2011, for example, the country's second-largest coal producer bought a stake in a Washington shipping terminal that would enable shipments of

millions of tons of Powder River Basin coal to Asian markets. Coal terminals have also been proposed at two other sites along the Columbia River. There is no indication that BLM has considered or plans to consider the environmental impacts of this additional demand for Powder River Basin coal in its Lease-by-Application process. In addition, BLM does not factor in the export of Powder River Basin coal to China and other foreign markets when determining what BLM calls the "fair market value" for coal offered in the Lease-by-Application process.

28.     The Powder River Basin was initially designated a Coal Production Region on November 9, 1979. *See* 44 Fed. Reg. 65,196 (Nov. 9, 1979). BLM considered several factors in making this designation:

> 1. Similarity in type and situation of coal; 2. General transportation and markets;
> 3. Broad economic and social-cultural similarities; 4. Administrative efficiency;
> and 5. Presence of Federal leases, preference right lease applications, and other
> indications of industry interest in Federal coal.

*Id.* In addition, BLM stated that in delineating Coal Production Regions, it included counties within which "substantial [coal] production may occur...." *Id.* at 65,197.

29.     The designation of Coal Production Regions serves three main purposes:

> First, they are the geographic areas for which the Secretary, guided by the coal
> production goals of the Department of Energy, establishes regional Federal coal
> leasing targets. Second, they represent the administrative regions within which
> the BLM, with guidance from regional coal teams, will conduct coal activity
> planning to identify potential lease tracts and schedule competitive lease
> sales....Third, the coal production regions serve to identify those areas in which
> the Department may offer competitive coal leases for sale after land use planning,
> activity planning, and environmental analysis have been completed.

*Id.* at 65,196.

30.     On January 9, 1990, BLM decertified the Powder River Coal Production Region. *See* 55 Fed. Reg. 784-85 (Jan. 9, 1990). BLM's rationale for decertification was based on "declining interest in coal leasing since 1982," and "regional coal market conditions (both past

and projected)" for Powder River Basin coal. *Id.* at 784. Decertification allowed BLM to lease coal in the Powder River Basin using the streamlined Lease-by-Application process. Environmental analysis under this process is conducted on a tract-by-tract basis.

31. Since decertification of the Powder River Federal Coal Region in 1990, Powder River Basin coal production increased from 184 million tons in 1990 to 495.9 million tons in 2008, an increase of 170 percent. Powder River Basin coal production has increased at a more rapid rate than other domestic coal production.

C.  **Environmental Impacts of Coal Leasing in the Powder River Basin**

32. Carbon dioxide is the leading cause of climate disruption and the most emitted greenhouse gas in the United States.

33. Coal mining releases greenhouse gases directly, including methane releases from coal seams and carbon dioxide from combustion of fuel for mining and transportation equipment.

34. However, the largest volume of greenhouse gases is released indirectly when mined coal is burned. The U.S. Environmental Protection Agency ("EPA") has determined that coal releases more carbon dioxide when burned than any other fossil fuel. Coal emits on average more than 200 pounds of carbon dioxide for every million British Thermal Units (BTUs) consumed. This amounts to an average of two tons of carbon dioxide for every one ton of coal burned. Subbituminous coal, the type produced in the Powder River Basin, is one of the most commonly burned coal types.

35. The Department of Energy has determined that subbituminous coal from the Powder River Basin releases between 212.7 and 213.4 pounds of carbon dioxide per million BTUs. This amount of carbon dioxide is higher than the U.S. average for subbituminous coal, and higher than all but one other subbituminous coal producing state.

36. Based on 2007 data, BLM determined that coal mining in the Powder River Basin led to the release of 877,103,673 tons of carbon dioxide, which comprised 40 percent of all carbon dioxide released by coal-fired power plants in the country, and 13 percent of the U.S. total across all sectors. This represents approximately 2.4 percent of global emissions of greenhouse gases. In 2008, the Department of Energy and EPA determined that the record amount of coal mined from the Powder River Basin that year led to the release of 907,227,268 tons of carbon dioxide.

37. BLM has recently proposed to offer 12 new Leases-by-Application in the Powder River Basin. Collectively, these leases propose to mine as much as 5.8 billion tons of coal from more than 37,571 acres. BLM has determined that, on the low end, the coal from these leases would release 6.19 billion tons of carbon dioxide, but may release up to 10.6 billion tons of carbon dioxide. The amount of carbon dioxide from these proposed leases would be more than was released by *all fossil fuel combustion* in the United States in 2007. This amount of greenhouse gas emissions could have catastrophic global-scale consequences.

**D.   Guardians' Petition and BLM's Response**

38. On November 23, 2009, Guardians submitted a Petition to the Secretary requesting that BLM: (1) recertify the Powder River Basin as a Coal Production Region, (2) address the climate change impacts of coal leasing, and (3) require coal companies to pay carbon fees for new leases to establish a global warming impact fund. The Secretary received Guardians' Petition on November 30, 2009.

39. Guardians' Petition included, and incorporated by reference, a report entitled "Undermining the Climate."

40. On January 28, 2011, BLM denied Guardians' Petition to recertify the Powder River Basin as a Coal Production Region.

41. In its Petition denial, BLM recognized that coal leasing in the Powder River Basin under the Lease-by-Application process is driven by the coal companies currently operating mines in the region based on their needs to maintain production at existing mines to meet increased demand for Powder River Basin coal. BLM also recognized that the Competitive Leasing Process, which applies to designated Coal Production Regions, allows the Secretary and BLM, rather than the coal companies, to determine the quantity of coal to be mined in a given region.

42. According to BLM, coal production has increased in the Powder River Basin "due to an increase in demand for electric power and the related increase in demand for steam coal as a fuel for low cost electric generation." BLM also noted other factors driving the increase in coal production in the region, including the "cost (mining and reclamation) advantages that have favored Powder River Basin coal over other domestic coal regions as well as the coal's low sulfur content which results in cost-effective air pollution control." BLM projects that the future "demand for domestic coal supplies, and in particular coal from the PRB, is expected to continue" at least until 2035 based on the Energy Information Administration's coal demand forecasts.

43. Under the current Lease-by-Application process, in order to meet the increased demand for Powder River Basin coal, coal companies nominate lease tracts adjacent to existing mines so that mining operations can easily move onto these adjacent "production maintenance tracts" with no break in coal production. Accordingly, one of BLM's rationales for denying

Guardians' Petition is that this orderly expansion of existing mines "can only work in a decertified coal production region" where leasing is governed by a tract-by-tract leasing process.

44. Another rationale provided by BLM for its denial of Guardians' Petition is that the Competitive Leasing process used in Coal Production Regions would be detrimental to the profits of the coal industry operating in the Powder River Basin. BLM asserts that "[r]egional leasing is difficult where existing mines are competing in an open coal market, depleting their existing leases at market rates, and needing to replace reserves throughout a continuum of time."

45. In its denial of Guardians' Petition, BLM did not discuss whether any of the factors that led to the decertification of the Powder River Basin in 1990 had changed over the last 20 years so as to render the 1990 decertification decision no longer valid given current coal production conditions in the Basin. Specifically, BLM based its 1990 decertification decision on "declining interest in coal leasing since 1982, and [a review of] regional coal market conditions (both past and projected). . . ." 55 Fed. Reg. 784 (Jan. 9, 1990).

46. Guardians' Petition and accompanying report, along with BLM's own statements in its denial of Guardians' Petition, demonstrate that the primary factor on which the 1990 decertification decision was predicated—decreased interest in Powder River Basin coal—no longer exists. As noted above, since the decertification decision, Powder River Basin coal production has increased from 184 million tons in 1990 to 496 million tons in 2008, an increase of 170 percent. Indeed, since 2000, Powder River Basin coal production has increased nearly 40 percent, from 360 million tons to a record 496 million tons annually. Hundreds of coal-fired power plants with various generating capacities in 38 states currently burn coal from the region. To meet the increasing demand for Powder River Basin coal, BLM has proposed 12 new coal leases in the Powder River Basin that would collectively mine up to 5.8 billion tons of coal.

47. One of the bases for Guardians' Petition was that the parcel-specific National Environmental Policy Act ("NEPA") analysis conducted under the Lease-by-Application process prevented BLM from comprehensively analyzing the environmental impacts of leasing.

48. BLM's response to this particular assertion included, in part, the following statements: (1) "Further, each NEPA analysis for PRB coal leasing assumes that if the PRB mines are not able to sufficiently produce coal in the future, then more non-PRB coal would be produced to compensate for any market shortfall[,]" and (2) "Limiting one or even several points of fuel supply will not affect coal use because of the diverse group of national and international suppliers."

49. These statements form part of the basis for the BLM's denial of Guardians' Petition.

50. These statements are arbitrary and capricious. In making these statements, BLM ignores the fact that existing power plants cannot easily shift from one source of coal to another. Coal-fired power plants are designed to burn a specific type of coal. Changing the type of coal burned at a coal-fired power plant can require millions of dollars in modifications to the power plant. Furthermore, plant operators are hesitant to make such modifications, as they can trigger increased environmental regulations.

51. BLM's statements are based on the arbitrary and capricious assumption that there is a practically unlimited supply of economically recoverable coal in the world. However, global coal production is expected to peak in 2011. *See* Patzek W. Tadeusz & Gregory D. Croft, *A global coal production forecast with multi-Hubbert cycle analysis*, 35 Energy 3109, 3112 (2010). In the U.S., excluding Alaskan coal, coal production is predicted to peak in 2015. *Id.*

52. BLM's statements also ignore the fact that almost all utilities use an economic or least-cost dispatch model. This means that even a slight increase in the cost of coal can result in less coal being consumed. BLM acknowledges that Powder River Basin coal has a price advantage over most other types of coal. Yet BLM arbitrarily assumes that if less of this price-advantaged Powder River Basin coal is available for sale in the market, coal without this price advantage would fill the void left by Powder River Basin coal. BLM fails to consider whether this void might be filled by other non-coal fuels, renewable energy, or demand-side management.

## CLAIM FOR RELIEF
### (Violation of the Administrative Procedure Act)

53. Each and every allegation set forth in this Complaint is incorporated herein by reference.

54. Pursuant to 5 U.S.C. § 553(e), Guardians petitioned the Secretary to recertify the Powder River Basin as a Coal Production Region, address global warming impacts of coal leasing, and require coal companies to pay a carbon fee for new leases to establish a Global Warming Impact Fund.

55. BLM denied Guardians' Petition despite evidence provided by Guardians, and acknowledged by BLM, that coal production had significantly increased in the Powder River Basin beyond levels contemplated by BLM when it decertified the region in 1990.

56. BLM denied Guardians' Petition despite evidence that BLM is not obtaining the actual fair market value for PRB coal using its Lease-by-Application process.

57. BLM's decision to deny Guardians' Petition in the face of compelling evidence that coal production in the Powder River Basin was at an all-time high was arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706(2).

58. BLM's decision to deny Guardians' Petition based on the assumption that limiting coal production in the Powder River Basin will not decrease coal consumption was arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs WildEarth Guardians, Sierra Club, and Defenders of Wildlife respectfully request that this Court:

A. Declare that Defendants' denial of Guardians' Petition was arbitrary, capricious, and contrary to law within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A);

B. Remand BLM's decision to the agency for further consideration;

C. Enjoin all further coal leasing authorizations by BLM in the Powder River Basin until the agency has considered Guardians' Petition in light of all of the relevant evidence;

D. Retain jurisdiction over this matter until such time as Defendants have complied with the Court's Order;

E. Award Plaintiffs reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable statutes; and

F. Grant such additional and further relief as the Court may deem just and appropriate.

Respectfully submitted this 4th day of April, 2011.

_/s/ for_
Matt Kenna (Bar No. CO0028)
Public Interest Environmental Law
679 E. 2nd Ave., Suite 11B
Durango, Colorado 81301
(970) 385-6914
matt@kenna.net

_/s/_
Adam M. Kron (Bar No. 992135)
Defenders of Wildlife
1130 17th Street N.W.
Washington, D.C. 20036
(202) 772-3224 (office)
(202) 682-1331 (fax)
akron@defenders.org

_/s/ for_
Robert Ukeiley (Bar No. MD 14062)
Law Office of Robert Ukeiley
435R Chestnut Street, Suite 1
Berea, Kentucky 40403
(859) 986-5402 (office)
(866) 618-1017 (fax)
rukeiley@igc.org

*Attorneys for Plaintiffs*