UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILDEARTH GUARDIANS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KEN SALAZAR, Secretary, U.S. Department of the Interior, *et al.*, <br><br> Defendants, <br><br> STATE OF WYOMING, *et al.*, <br><br> Defendant-Intervenors. | Civil Action No. 11-00670 (CKK) |

MEMORANDUM OPINION
(May 10, 2012)

Plaintiffs, WildEarth Guardians, Sierra Club, and Defenders of Wildlife, bring this Administrative Procedure Act ("APA") action against the Secretary of the U.S. Department of the Interior (the "Secretary") and the Director of the Bureau of Land Management (the "BLM") (together, the "Federal Defendants"), challenging the BLM's denial of WildEarth Guardians' petition seeking the recertification of the Powder River Basin as a "coal production region" under 43 C.F.R. § 3400.5. Intervening as defendants are the State of Wyoming, the National Mining Association, and the Wyoming Mining Association (collectively, "Defendant-Intervenors").

Currently before the Court are the parties' cross-motions for summary judgment. Upon careful consideration of the parties' submissions, the relevant authorities, and the record as a whole, the Court finds that Plaintiffs have failed to discharge their burden of establishing that they meet the irreducible constitutional minimum of standing. Accordingly, the action shall be DISMISSED WITHOUT PREJUDICE for lack of jurisdiction. The Court does not reach the

merits of the BLM's denial of WildEarth Guardians' petition.

## I. BACKGROUND

### A. Statutory and Regulatory Background

The Mineral Leasing Act of 1920 (the "Act") provides that "[d]eposits of coal . . . and lands containing such deposits owned by the United States . . . shall be subject to disposition in the form and manner provided in this chapter." 30 U.S.C. § 181. Under the Act, the Secretary is permitted to lease public lands for coal mining operations after conducting a competitive bidding process:

> The Secretary of the Interior is authorized to divide any lands subject to this chapter which have been classified for coal leasing into leasing tracts of such size as he finds appropriate and in the public interest and which will permit the mining of all coal which can be economically extracted in such tract and thereafter he shall, in his discretion, upon the request of any qualified applicant or on his own motion, from time to time, offer such lands for leasing and shall award leases thereon by competitive bidding[.]

30 U.S.C. § 201(a)(1). By its terms, the Act mandates that any coal leasing authorized by the Secretary be done by competitive bidding and prescribes conditions for such leasing—for example, by requiring accepted bids to meet or exceed fair market value. However, the Act has little to say about the competitive bidding process itself. Instead, Congress elected to confer upon the Secretary "sweeping authority" to promulgate regulations designed to carry out the statutory command. *Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1039 (D.C. Cir. 2002), *cert. denied sub nom. Indep. Petroleum Ass'n of Am. v. Watson*, 537 U.S. 1105 (2003); *see also* 30 U.S.C. § 189 ("The Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations to do any and all things necessary to carry out and accomplish the purposes of this chapter.").

Pursuant to his broad authority, the Secretary enacted regulations delineating how the BLM would "conduct competitive leasing of rights to extract [f]ederal coal." 43 C.F.R. § 3420.0-1. The regulations provide for two different coal leasing processes: (1) the regional leasing process; and (2) the leasing-by-application process. *See* 43 C.F.R. pt. 3420. Both processes are forms of competitive leasing, as both contemplate an open, public, and competitive sealed-bid process and both preclude the BLM from issuing a coal lease if the highest bid does not meet or exceed fair market value. *See* 43 C.F.R. §§ 3422.1, 3422.2, 3425.4.

The regional leasing process is primarily agency-driven, with the BLM identifying public lands for prospective use and offering coal leases for sale. *See* RULES & REGULATIONS: PUBLIC PARTICIPATION IN COAL LEASING, 64 Fed. Reg. 52,239, 52,240 (Sept. 28, 1999). The regional leasing process applies only in areas designated as "coal production regions," which are creatures of regulation and the boundaries of which the BLM is empowered to alter:

> The Bureau of Land Management shall establish by publication in the Federal Register coal production regions. A coal production region may be changed or its boundaries altered by publication of a notice of change in the Federal Register. Coal production regions shall be used for establishing regional leasing levels[.]

43 C.F.R. § 3400.5. This provision was designed to "[a]uthorize the Bureau of Land Management to establish coal production regions for the purpose of setting coal leasing levels and for other coal management purposes." PROPOSED RULES: COAL MANAGEMENT; FEDERALLY OWNED COAL; AMENDMENTS TO COAL MANAGEMENT PROGRAM REGULATIONS, 46 Fed. Reg. 61,390, 61,391-61,392 (Dec. 16, 1981). The applicable regulations do not require the BLM to establish specific coal production regions nor provide guidance as to when and where the establishment of such regions would be appropriate. However, once the BLM has established a

coal production region, the regulations specify how the BLM should go about setting "regional leasing levels." 43 C.F.R. § 3420.2. When setting regional leasing levels, the BLM must—in consultation with other federal agencies, state and local governments, tribes, and regional coal teams—take into account such factors as national energy needs, industry interest in coal development, and the potential economic, social, and environmental effects of coal leasing on the region. *Id.* § 3420.2(c).

The leasing-by-application process, in contrast, is primarily applicant-driven, with the applicant assuming responsibility for identifying public lands for potential use and proposing specific tracts for leasing. *See id.* §§ 3425.0-2-3425.5. The leasing-by-application process applies in "areas outside coal production regions" and in areas within coal production regions "where an emergency need for unleased coal deposits is demonstrated." *Id.* §§ 3425.0-2, 3425.1-5. Unlike the regional leasing process, the leasing-by-application process is not structured around regional leasing levels, but the BLM must nevertheless perform an environmental analysis. *See id.* § 3425.4.

### B. Case-Specific Background[1]

In 1979, the BLM established several coal production regions, including the Powder River Coal Production Region, an administrative area corresponding to the Powder River Basin—a geographic area of approximately 24,000 square miles spanning northeastern Wyoming and southeastern Montana. *See* IDENTIFICATION OF COAL PRODUCTION REGIONS HAVING MAJOR

---

[1] The Court avoids the phrase "factual background" because, under the APA, "[t]he entire case . . . is a question of law" and the "complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

FEDERAL COAL INTERESTS, 44 Fed. Reg. 65,196, 65,196 (Nov. 9, 1979). As a result, beginning in 1979, any leasing in the Powder River Basin was presumptively to be conducted in accordance with the regional leasing process, which remained the state of affairs for the next decade.

In 1989, however, the BLM solicited public comments on the potential total or partial decertification of the Powder River Coal Production Region, citing such considerations as "limited leasing interest in the region, soft market considerations for the foreseeable future, [] public input," and "administrative efficiency." PROPOSED DECERTIFICATION OF ALL OR A PORTION OF THE POWDER RIVER COAL PRODUCTION REGION, 54 Fed. Reg. 6,339, 6,339-6,340 (Feb. 9, 1989); *see also* POWDER RIVER REGIONAL COAL TEAM ACTIVITIES: PUBLIC MEETING ANNOUNCEMENT, 54 Fed. Reg. 35,941 (Aug. 30, 1989). The BLM noted that "if the region were partially or totally decertified, then these areas would be opened to leasing-by-application," but left open the possibility "for the re-establishment of the regional activity planning process, should market conditions strengthen and more widespread leasing again become[] necessary." PROPOSED DECERTIFICATION OF ALL OR A PORTION OF THE POWDER RIVER COAL PRODUCTION REGION, 54 Fed. Reg. at 6,339-6,340.

On January 9, 1990, the BLM formally decertified the Powder River Coal Production Region as a coal production region, which had the effect of replacing the regional leasing process with the leasing-by-application process in that area. *See* DECERTIFICATION OF THE POWDER RIVER COAL PRODUCTION REGION, 55 Fed. Reg. 784, 784 (Jan. 9, 1990). The BLM adopted the recommendation of the regional coal team that the region be completely decertified subject to certain conditions. *Id.* Therefore, beginning in early 1990, "[f]ederal coal lease applications [could] . . . be filed in accordance with 43 C.F.R. § 3425"—that is, pursuant to the leasing-by-

application process. *Id.* at 785. Since then, the leasing-by-application process has been the exclusive leasing method used by the BLM in the Powder River Basin. Indeed, because the BLM has decertified all other coal production regions, the leasing-by-application process is now the exclusive leasing method used nationwide. J.A. 5.

On November 23, 2009, WildEarth Guardians filed a five-page petition with the BLM, accompanied by a written report, seeking the recertification of the Powder River Basin as a coal production region under 43 C.F.R. § 3400.5. J.A. 9-50.[2] WildEarth Guardians claimed that decertification of the Powder River Basin is no longer appropriate today because the region produces more coal than anywhere else in the United States and because coal production in the region, which is only expected to intensify, is a leading contributor to nationwide greenhouse gas emissions. J.A. 10. WildEarth Guardians further argued that recertification of the Powder River Basin is appropriate because the "streamlined" leasing-by-application process "diminishe[s] competition" and "prevent[s] the [BLM] from fully analyzing and addressing the environmental impacts—in particular the global warming impacts—of coal leasing in the Powder River Basin." J.A. 9-10.

On January 8, 2011, the BLM denied WildEarth Guardians' petition in a thorough eight-page decision. J.A. 1-8. The BLM concluded that the Powder River Basin continued to be effectively managed "as a decertified coal region." J.A. 7. First, the BLM found that, despite the "growth" in production in the region, leasing had occurred at "essentially the same rate as reserves have been depleted" and "no new mining operations" had opened since decertification.

---

[2] WildEarth Guardians' petition also asked the Secretary to establish a carbon fee for new coal leases and lease interest transfers, but Plaintiffs have not pursued that aspect of the petition in this case.

J.A. 4. Second, the BLM found that decertification was conducive to "maintenance leasing," under which existing operations expand into adjacent tracts as reserves are depleted "without leaving tracts un-leased and undeveloped." J.A. 4. Third, the BLM found that because the regional leasing process requires the agency to "complete geologic exploration activities and fund regional NEPA analysis," its "current budget forecast and possible lack of personnel" were such that adoption of the regional leasing process could result in a "reduced return to the public from coal sales (due to timing), a higher potential for bypass . . . , and forced emergency leasing." J.A. 5. Fourth, the BLM found that "sales are always competitive" under either leasing process "because the BLM sets a [fair market value] . . . and will not accept any bid that does not meet that value." J.A. 5. Fifth, the BLM found that the leasing-by-application process requires the agency to conduct environmental analyses in connection with specific lease sales, including a "cumulative impact analysis [that] evaluates the contribution of the site-specific alternatives to cumulative effects on the environment." J.A. 6.

C. **Procedural History**

Plaintiffs commenced this action on April 4, 2011, asserting a single claim for relief under the APA based on their contention that the BLM's denial of WildEarth Guardians' petition was arbitrary, capricious, and contrary to law. *See* Compl. for Declaratory Judgment & Injunctive Relief, ECF No. [1], ¶¶ 54-58. The Federal Defendants appeared and answered the Complaint. *See* Fed. Defs.' Answer, ECF No. [16]. The State of Wyoming, the National Mining Association, and the Wyoming Mining Association were granted leave to intervene as defendants and answered the Complaint. *See* Order (June 23, 2011), ECF No. [18]; State of Wyoming's Answer, ECF No. [19]; Wyoming Mine Association's Answer, ECF No. [20]; Answer &

Affirmative Defenses of National Mining Association, ECF No. [22].

The Federal Defendants filed the Administrative Record on August 18, 2011. *See* Fed. Defs.' Notice of Lodging & Serving of Admin. R., ECF No. [26]. Plaintiffs then moved to "correct" the record, claiming it did not include certain materials that were allegedly before the BLM when it denied WildEarth Guardians' petition. On November 9, 2011, the Court denied Plaintiffs' motion, finding they had "failed to meet their burden of adducing clear and concrete evidence demonstrating that the administrative record certified by the Federal Defendants in this action is incomplete." Mem. Op. & Order (Nov. 9, 2011), ECF No. [37], at 8.

Thereafter, the parties proceeded to brief the pending cross-motions for summary judgment. The motions are now fully briefed and ripe for adjudication. While the Court's decision today is based on the record as a whole, its consideration has focused on the following documents, listed in chronological order of their filing: Mem. of P. & A. in Supp. of Mot. for Summ. J. by Pls., ECF No. [40] ("Pls.' [40] Mem."); Def-Intervenors' Mem. of P. & A. in Supp. of Their Cross-Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J., ECF Nos. [41], [42]; Fed. Defs.' Combined Mem. of Law in Supp. of Their Cross-Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J., ECF Nos. [43-1], [44]; Reply in Supp. of Mot. for Summ. J. by Pls. & Resp. in Opp'n to Defs.' & Intervenors' Cross-Mots. for Summ. J., ECF Nos. [45], [46] ("Pls.' [46] Mem."); Def.-Intervenors' Reply in Supp. of Their Cross-Mot. for Summ. J., ECF No. [48]; Fed. Defs.' Reply Mem. in Supp. of Their Cross-Mot. for Summ. J., ECF No. [49]. In an exercise of its discretion, the Court finds that holding oral argument on the pending motions would not be of assistance in rendering a decision. *See* LCvR 7(f).

## II.  DISCUSSION

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982).  "In order to establish the existence of a case or controversy within the meaning of Article III, [a] party must meet certain constitutional mimima," including "the requirement that . . . it has standing to bring the action." *Gettman v. DEA*, 290 F.3d 430, 433 (D.C. Cir. 2002).  The "irreducible constitutional minimum" of standing requires: (1) an injury in fact; (2) causation; and (3) redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008).

In this case, Plaintiffs concede, as they must, that the BLM's mere denial of WildEarth Guardians' petition is insufficient to support their standing.  *See Gettman*, 290 F.3d at 433-34 (rejecting the suggestion that an agency's denial of a rulemaking petition confers "automatic standing" upon the petitioner).  Instead, Plaintiffs argue three different theories of standing: (1) procedural standing; (2) informational standing; and (3) substantive standing.  The Court addresses each theory in turn.

### A.  Procedural Standing

In standing doctrine, "'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Defenders of Wildlife*, 504 U.S. at 573 n.7.

Specifically, "[a] plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

While the normal standards of redressability and immediacy are "relaxed" in this context, the requirements of injury in fact and causation are not. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). To establish procedural standing, the plaintiff must still (1) identify a procedural right afforded by statute and designed to protect the plaintiff's concrete and personal interest, (2) show that the defendant omitted the required procedure, and (3) demonstrate that it is substantially probable that the procedural breach will cause injury to the plaintiff's concrete and personal interest. *See Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664-65 (D.C. Cir. 1996) (*en banc*); *N.Y. Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 587 (D.C. Cir. 2011); *Ctr. for Law & Educ.*, 396 F.3d at 1157. As this standard makes clear, "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

Plaintiffs contend that they can invoke the relaxed standard for procedural standing because they are "being denied procedural opportunities that they would have if the Powder River Basin was designated as a Coal Production Region and leasing was conducted pursuant to the [Regional] Leasing process." Pls.' [40] Mem. at 12 (citing Decl. of Jeremy Nichols ("Nichols Decl."), ECF No. [40-1], ¶ 14). Specifically, Plaintiffs claim that if the BLM granted

WildEarth Guardians' petition, and if the Powder River Basin was recertified as a coal production region, then the BLM would be required to establish regional leasing levels under 43 C.F.R. § 3420.2(c), delineate lease tracts and rank them in order of prioritization under §§ 3420.3-1 and 3420.3-4(a), prepare a regional lease sale environmental impact statement under § 3420.3-4(c), and publish a regional lease sale schedule under § 3420.5-1. *See* Nichols Decl. ¶ 14.

Plaintiffs misapprehend the reach of procedural standing. Procedural rights are accorded a special status in standing doctrine not because the law values procedures in the abstract, but because courts recognize the "prophylactic nature of procedural rights." *Ctr. for Law and Educ.*, 396 F.3d at 1167 (Edwards, J., concurring). The strictures of standing are relaxed in this context because there is a presumption that procedures are meaningful: if followed, they may or may not affect the substantive result, but they will guide and inform the agency's decision-making. Of course, procedures are only relevant in this "prophylactic" sense if they *precede* the agency's final action. For example, the "archetypal procedural injury" is "an agency's failure to prepare a statutorily required environmental impact statement *before* taking action with potential adverse consequences to the environment." *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005) (emphasis added).

Plaintiffs put the cart before the horse. In support of their procedural standing theory, all Plaintiffs claim is that if the BLM reached a different substantive result on WildEarth Guardians' petition, then they might benefit from certain procedural protections attaching to the regional leasing process down the road. Plaintiffs do not claim that the BLM omitted a procedural requirement *before* denying WildEarth Guardians' petition—the only agency action at issue in this case. Nor could they. The BLM satisfied the few procedural requirements mandated in this

11

context: it provided WildEarth Guardians with notice of its denial of the petition and "a brief statement of the grounds." 5 U.S.C. § 555(e).

Accordingly, the Court concludes that Plaintiffs have failed to establish that they have procedural standing to pursue this case.[3]

### B. Informational Standing

The concept of informational standing is unique in standing doctrine; if not properly cabined, it runs the risk of swallowing the limitations placed on the exercise of judicial power by Article III. *See generally* Cass R. Sunstein, *Informational Regulation & Informational Standing: Akins and Beyond*, 147 U. PA. L. REV. 613 (1999). Therefore, informational standing "arises only in very specific statutory contexts where a statutory provision has explicitly created a right to information." *Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 539 F. Supp. 2d 4, 15 (D.D.C. 2008) (internal quotation marks omitted), *aff'd*, 358 F. App'x 179 (D.C. Cir. 2009) (*per curiam*), *cert. denied*, __ U.S. __, 131 S. Ct. 1062 (2011).[4] To establish informational standing, a plaintiff must (1) identify a statute that, on plaintiff's reading, directly requires the defendant to disclose information that the plaintiff has a right to obtain, (2) show that it has been denied the information to which it is entitled, and (3) provide a credible claim that the information would be helpful to it. *See FEC v. Akins*, 524 U.S. 11, 21 (1998); *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 22-23 (D.C. Cir. 2011); *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002).

---

[3] Plaintiffs do not argue that the alleged "procedural injuries" they have identified would satisfy the more stringent standard for standing. Even if they had made this argument, these alleged injuries are not (1) concrete, particularized, actual, or imminent, or (2) fairly traceable to the BLM's denial of WildEarth Guardians' petition.

[4] Congress, not agencies, has the ability to relax the strictures of standing when it statutorily defines procedural and informational rights. *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15-16 (D.C. Cir. 2011); *see also Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 958-59 (7th Cir. 2005) ("[A]n act of Congress would seem to be necessary to establish a right to information sufficient to confer informational standing.").

Informational standing does not extend to "situation[s] where . . . the plaintiff's view of the statute would not *directly* entitle it to the information it seeks." *ASPCA*, 659 F.3d at 24 (emphasis added).

Plaintiffs contend they are "being denied information that they would otherwise be able to obtain if the Powder River Basin was designated as a Coal Production Region." Pls.' [40] Mem. at 12 (citing Nichols Decl. ¶ 14). In their briefs, Plaintiffs identify a single "example" of their alleged informational injuries. Plaintiffs contend that if the BLM granted WildEarth Guardians' petition, and if the BLM recertified the Powder River Basin as a coal production region, then "[t]he first step in the regional coal leasing process . . . is to prepare a long range market analysis" and "this information would be useful" to Plaintiffs' members. Pls.' [46] Mem. at 5 (citing J.A. 144).[5] There are at least two problems with this argument. First, Plaintiffs have not pointed the Court to a *statute* that, on their reading, requires the Federal Defendants to disclose long range market analyses. Instead, Plaintiffs cite only to a flowchart, excerpted from the 1989 BLM Manual, that outlines the steps in the regional leasing process, J.A. 144, and the flowchart is no substitute for a statutory provision "explicitly creat[ing] a right to information," *Ass'n of Am. Physicians & Surgeons*, 539 F. Supp. 2d at 15. Second, even if Plaintiffs were to

---

[5] In the affidavit accompanying their briefs, Plaintiffs also suggest that if the BLM granted WildEarth Guardians' petition, and if the Powder River Basin were recertified as a coal production region, then the BLM would then be required to establish regional leasing levels under 43 C.F.R. § 3420.2(c), delineate lease tracts and rank them in order of prioritization under §§ 3420.3-1 and 3420.3-4(a), prepare a regional lease sale environmental impact statement under § 3420.3-4(c), and publish a regional lease sale schedule under § 3420.5-1. *See* Nichols Decl. ¶ 14. Even affording the regulations a generous construction, most of them relate to procedural requirements, not informational rights. In any event, Plaintiffs' reliance on these regulations is misplaced for the same two reasons their reliance on long range market analyses is misplaced: (1) Plaintiffs have failed to identify a *statute* that requires the Federal Defendants to disclose information to which they are entitled; and (2) even if Plaintiffs were to hypothetically prevail on the merits in this action, they still would not be *directly* entitled to such information because its preparation and disclosure would depend upon future administrative action separate and distinct from the BLM's denial of WildEarth Guardians' petition.

13

hypothetically prevail on the merits in this action, they still would not be *directly* entitled to the information they seek. Rather, the preparation and disclosure of long range market analyses would depend upon future administrative action that is separate and distinct from the only agency action at issue in this case—the BLM's denial of WildEarth Guardians' petition for rulemaking. In other words, the "informational event," as it were, is at least one step removed from the actual agency action at issue in this case.[6] *Cf. ASPCA*, 659 F.3d at 23-24.

Accordingly, the Court concludes that Plaintiffs have failed to establish that they have informational standing to pursue this case.

### C. Substantive Standing

To establish substantive standing, a plaintiff "must show (1) an injury in fact that is 'concrete and particularized' and 'actual or imminent'; (2) that the injury is fairly traceable to the defendant's challenged conduct; and (3) that the injury is likely to be redressed by a favorable decision." *ASPCA*, 659 F.3d at 19 (quoting *Defenders of Wildlife*, 504 U.S. at 560-61). Where, as here, "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

Plaintiffs claim that they have substantive standing because their members have reasonable concerns that the climate and other environmental impacts of coal mining under the leasing-by-application process will harm their aesthetic and recreational interests in the Powder

---

[6] In truth, it is likely several steps removed. *See infra* Part II.C.

River Basin and its wildlife. *See* Pls.' [40] Mem at 10-11.[7] It is by now well established that such aesthetic and recreational interests can support an injury in fact. *See Summers*, 555 U.S. at 494 ("While generalized harm to . . . the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Nonetheless, Plaintiffs must still show that the alleged harms to their aesthetic and recreational interests are likely to be redressed by a favorable decision in this case. *Nat'l Comm. for New River, Inc. v. FERC*, 433 F.3d 830, 832 (D.C. Cir. 2005). It is here where Plaintiffs' argument falters.[8]

Plaintiffs claim that the BLM's denial of WildEarth Guardians' petition harms their aesthetic and recreational interests because mining in the Powder River Basin will result in increased air, water, and land pollution and various climate change impacts such as greater drought conditions and a reduction in biodiversity. *See* Pls.' [40] Mem. at 11-12 (citing Nichols Decl. ¶¶ 17-22, 28-46). Plaintiffs reason that their injuries would be redressed by a favorable outcome in this case because, if the Powder River Basin was recertified, the BLM "could set a

---

[7] More precisely, Plaintiffs rely upon the interests of one of their members who lives in Golden, Colorado and regularly travels to the Powder River Basin for personal and professional reasons. *See* Nichols Decl. ¶¶ 2, 5-6, 18-19.

[8] Plaintiffs also bear the burden of showing that the alleged harms are fairly traceable to the BLM's denial of WildEarth Guardians' petition, but where, as here, "the purported cause of injury . . . and the injury itself [are] separated by intervening actors and events, the causation and redressability inquiries may appear to merge." *Ctr. for Law & Educ.*, 396 F.3d at 1160 n.2. For purposes of analytical clarity, the Court confines its discussion to the redressability requirement.

ceiling on coal leasing" and there could be an overall reduction in coal production in the region, thereby reducing adverse environmental impacts. *Id.* at 12 (citing Nichols Decl. ¶¶ 47-50).

Plaintiffs have not shown that their alleged injuries are likely to be redressed by a favorable decision in this case. Preliminarily, Plaintiffs imply that a favorable outcome here would inexorably lead to the recertification of the Powder River Basin, but that is not the case. WildEarth Guardians' petition was made under 5 U.S.C. § 553(e), which requires "[e]ach agency [to] . . . give an interested person the right to petition for the issuance, amendment, or repeal of a rule." In this case, Plaintiffs do not seek injunctive relief, but rather ask the Court to "vacate [the] BLM's decision . . . and remand to [the] agency for further consideration." Pls.' [46] Mem. at 22. Therefore, even assuming Plaintiffs succeed on the merits, the only relief available to them would be a remand to the BLM for further consideration of the petition. In such a case, even assuming the BLM were to grant WildEarth Guardians' petition upon further consideration, then the BLM still might decide to provide notice of the proposed recertification in the Federal Register and solicit public input before making a final decision on recertification. *See* 5 U.S.C. § 553(b)-(c); 43 C.F.R. § 14.4. Any number of things could happen during that process that are beyond the predictive powers of the parties and this Court.[9] Plaintiffs elide over these unknowns, and presume that once their petition is granted, recertification will follow in more or less the same form as pre-1990 certification.

---

[9] Simply by way of example, although Plaintiffs treat the Powder River Basin as if it is an indivisible whole, the region spans 24,000 square miles and crosses two States. Even if some form of recertification receives the BLM's approval, the area(s) designated as a coal production region might not conform to the boundaries of the Powder River Basin or the old Powder River Coal Production Region. *See* 43 C.F.R. § 3400.5. For any number of reasons, interested parties or the BLM itself may think partial recertification more appropriate than wholesale recertification, or that areas outside of the old Powder River Coal Production Region should be brought into the fold, and there is no reason to assume that the precise areas recertified would be the same ones that underlie Plaintiffs' aesthetic and recreational interests, *see* Nichols Decl. ¶¶ 17, 19, or that the "region" used for establishing regional leasing levels would be the same one that Plaintiffs now have in mind.

Ultimately, though, the disconnect between the outcome of WildEarth Guardians' petition, and a determination as to whether recertification is appropriate and, if so, the form it should take, is the least of Plaintiffs' problems. Even assuming, for the sake of argument, that recertification happens more or less as Plaintiffs envision, Plaintiffs still have not shown that their alleged injuries are likely to be redressed by a favorable decision in this case. Plaintiffs claim that, with recertification, the BLM "could set a ceiling on coal leasing," Pls.' [40] Mem. at 12, but their assumption that regional leasing would be set at a level that would redress their alleged injuries is speculative because the regional leasing process does not evince a preference for a particular level of leasing. Rather, when setting regional leasing levels, the BLM considers a multitude of diverse factors, including, but not limited to: the economic, social, and environmental effects of leasing on the region; industry interest and competition in the region; demand for coal reserves; and national energy needs and coal production goals. *See* 43 C.F.R. § 3420.2(c). Nor does the BLM set regional leasing levels in a vacuum, but rather can exercise its expertise only after considering input from the public, regional coal teams, affected Indian tribes, the governors of affected States, and the U.S. Department of Justice. *See id.*

Similarly, Plaintiffs claim that "[r]ecertification could also lead to reduced coal production in the Powder River Basin," Pls.' [40] Mem. at 12, but countless independent actions—some by the BLM and some by third parties—must intervene between recertification and actual coal production. *See generally NRDC, Inc. v. Jamison*, 815 F. Supp. 454, 456-57 (D.D.C. 1992) (describing the several stages of the coal leasing process). Among other things, the BLM would need to engage in land use planning, establish regional leasing levels, delineate lease tracts, rank tracts in order of prioritization, prepare a regional lease sale environmental

17

impact statement, publish a regional lease sale schedule, provide public notice of sales, solicit competitive bids, determine that bids meet or exceed fair market value, and award leases. *See* 43 C.F.R. §§ 3420.1-4, 3420.2, 3420.3-1, 3420.3-4, 3420.5-1, 3422.1, 3422.2, 3422.4.[10] The behavior of various third parties would be integral to this multifaceted process: coal mining companies would have to be willing to bid on specific lease tracts and make offers meeting the BLM's terms; affected States would have to authorize mining permits; etc. *See Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 366 F.3d 930, 941-42 (D.C. Cir. 2004) (noting that where the relationship between agency action and third-party conduct is not obvious, "formidable evidence" is required) (quotation marks omitted), *cert. denied*, 545 U.S. 1154 (2005).

The central point is this: the denial of WildEarth Guardians' petition and the recertification of the Powder River Basin are many, many steps removed from the injuries identified by Plaintiffs. Plaintiffs' theory of redressability depends on "a lengthy chain of conjecture," *Fla. Audubon Soc.*, 94 F.3d at 666, that piles "speculation upon hypothetical upon speculation," *N.Y. Reg'l Interconnect*, 634 F.3d at 587. Moreover, "[e]ven if all these additional events transpired, [Plaintiffs'] injury would be caused by some action other than" the specific agency action before the Court. *Occidental Permian Ltd. v. FERC*, 673 F.3d 1024, 1026 (D.C. Cir. 2012). Accordingly, the Court concludes that Plaintiffs have also failed to establish that they have substantive standing to pursue this case.

---

[10] *Cf. Ctr. for Biological Diversity v. DOI*, 563 F.3d 466, 478-79 (D.C. Cir. 2009) ("In order to reach the conclusion that Petitioners are injured because of Interior's alleged failure to consider the effects of climate change with respect to the Leasing Program, Petitioners must argue that: adoption of the Leasing program will bring about drilling; drilling, in turn, will bring about more oil; this oil will be consumed; the consumption of this oil will result in additional carbon dioxide being dispersed into the air; this carbon dioxide will consequently cause climate change; this climate change will adverse affect the animals and their habitat; therefore Petitioners are injured by the adverse effects on the animals they enjoy."); *Fla. Audubon Soc.*, 94 F.3d at 666.

## III. CONCLUSION

Standing is a jurisdictional requirement. *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012). As a result, when the requisite showing has not been made, "the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 7 Wall. 506, 514 (1868). Accordingly, the Court's inquiry is at an end.[11] The Court shall GRANT Defendant-Intervenors' [41] Cross-Motion for Summary Judgment and the Federal Defendants' [43] Cross-Motion for Summary Judgment insofar as they seek the dismissal of this action for lack of standing and the action shall be DISMISSED WITHOUT PREJUDICE on that basis. Plaintiffs' [40] Motion for Summary Judgment, and the remainder of Defendant-Intervenors' and the Federal Defendants' cross-motions, shall be DENIED as moot. An appropriate Order accompanies this Memorandum Opinion.

Date: May 10, 2012

/s/
**COLLEEN KOLLAR-KOTELLY**
United States District Judge

---

[11] However, if Plaintiffs had standing, the Court would adhere to its prior holding that "the question of when and where to establish coal production regions is a matter that has been committed to the BLM's discretion by law and lies beyond the ambit of judicial review." *WildEarth Guardians v. Salazar*, 783 F. Supp. 2d 61, 74 (D.D.C. 2011). To the extent circumscribed judicial review of the BLM's discretion is called for in the context of a petition under 5 U.S.C. § 553(e), the BLM "has adequately explained the facts and policy concerns it relied on and [the Court is satisfied] that those facts have some basis in the record." *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008) (internal quotation marks omitted); *see also Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 4-5 (D.C. Cir. 1987). When "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), the dismissal must be for failure to state a claim, *see Sierra Club v. Jackson*, 648 F.3d 848, 853-54 (D.C. Cir. 2011), which is an adjudication on the merits. Therefore, although the end result would for all practical purposes be the same, the Court cannot rely on this ground as an alternative basis for its decision.